IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOANN C. SCHAUDT, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) Case No. 12 CV 3301 |
| | ) |
| UNITED STATES OF AMERICA, | ) Judge John Z. Lee |
| | ) |
| Appellee. | ) |

**MEMORANDUM OPINION AND ORDER**

After twenty two years of marriage, Joann C. Schaudt ("Schaudt") filed for divorce from her husband Robert Schaudt ("Robert"). At the time, Robert was being pursued by the Internal Revenue Service ("IRS") for over a half million dollars in unpaid taxes. As part of the marriage settlement agreement, Robert conveyed their Northbrook house valued at $539,000.00 to Schaudt in a quitclaim deed, but retained responsibility for any pre-divorce tax liabilities. Both Schaudt and Robert continued to reside at the house post-divorce. Schaudt subsequently filed for bankruptcy, and after a bench trial, the Bankruptcy Court ruled that certain debt related to the house was nondischargeable because Schaudt had actively and willingly participated in fraudulently conveying the house and associated liens from Robert to her as a means of evading the IRS' reach. Schaudt now appeals that ruling. For the following reasons, the judgment of the Bankruptcy Court is affirmed.

**Facts**

In 2011, the Bankruptcy Court held a bench trial and made the following findings of fact, which appear in its March 16, 2012, Memorandum Opinion.[1] In June 1973, Schaudt and Robert

---

[1] *See In re Schaudt*, No. 09 A 1322, 2012 WL 909299 (Bankr. N.D. Ill. Mar. 16, 2012).

1

married. (Bankr. Ct. Mem. Op. 2.) They have three children, all of whom are now adults. (*Id.*) Robert is a software engineer who developed an inventory tracking software program used by automobile dealerships. (*Id.*) He set up a sole proprietorship to market and service the program. (*Id.*)

In the mid-1990s, Robert and his brother were co-trustees of a family trust that held title to a house in Northbrook, Illinois (the "Northbrook House"), where Robert, Schaudt, and their children lived. (*Id.*) The trust provided that upon the death of Robert's parents, the Northbrook House would be transferred to him. (*Id.*) By May 1996, both of Robert's parents had died and Robert held legal title to the Northbrook House. (*Id.*)

Around that same time, the IRS filed liens against Robert and Schaudt for back taxes owed by the sole proprietorship. (*Id.*) In March 1997, Robert formed Zeus Concepts, LLC to take over operation of his software business and, according to Robert, to prevent the United States from recovering tax liens. (*Id.*) A trust known as the Zeus Trust owned 98% of the shares in Zeus Concepts. (*Id.*) Schaudt owned the remaining 2%. (*Id.*) The three Schaudt children are the sole beneficiaries of the Zeus Trust. (*Id.*)

In the late 1990s, Schaudt applied for a loan to purchase a car, but was denied the loan because of the tax liens filed against her and Robert. (*Id.* 24.) Schaudt hired an attorney to obtain "innocent spouse" recognition from the IRS for Robert's tax debts.[2] (*Id.*) On February 24, 2000, she received a letter from the IRS granting her request and disassociating her from Robert's tax debts. (*Id.*) The letter included three Certificates of Release of Federal Tax Lien releasing her from the tax debts, which were listed on the Certificates and totaled $530,084.00. (*Id.*)

---

[2] "Innocent spouse" recognition relieves an individual on a joint tax return of his or her joint and several liability for the return if the individual can demonstrate that he or she did not know and had no reason to know that the returns were inaccurate. 26 U.S.C § 6013(d)(3).

By 2005, Schaudt and Robert were meeting with a tax attorney to discuss Robert's tax debts. (*Id.*) In August 2005, their tax attorney communicated with an IRS agent who was inquiring about the ownership of the Northbrook House. (*Id.* 25.) On August 5, 2005, the tax attorney ordered and received a title report on the Northbrook House. (*Id.*) On October 14, 2005, the tax attorney sent the report to the IRS agent, and on November 7, 2005, the IRS agent sent the tax attorney a letter acknowledging receipt of the report. (*Id.*)

On November 15, 2005, eight days later, Schaudt filed for divorce. (*Id.*) She was represented by counsel, but Robert was not. (*Id.* 3.) On December 5, 2005, less than three weeks later, the judge presiding over the divorce proceeding entered an uncontested dissolution judgment which incorporated a marriage settlement agreement. (*Id.*) The agreement provided that Robert would convey the Northbrook House, then valued at $539,000.00, to Schaudt, and would pay her $8,000.00 per month indefinitely, even if she remarried. (*Id.*) The agreement further provided that Robert was responsible for any pre-divorce tax liabilities. (*Id.*) In return, Schaudt gave Robert her 2% interest in Zeus Concepts, which was valued at $84,000.00. (*Id.*) On December 20, 2005, Robert quitclaimed the Northbrook House to Schaudt, but he continued to live with her in the house. (*Id.*)

In April 2006, Schaudt took out a $377,300.00 loan from Countrywide Bank, which was secured by a mortgage on the Northbrook House. (*Id.* 3-4.) In the loan application, she stated that she had owned the Northbrook House for 26 years, had $13,000.00/month in employment income, was a vice president of Zeus Concepts, and had been working at Zeus Concepts for the past 26 years. (*Id.* 4.) These statements were not true. (*Id.*)

Schaudt used approximately $170,000.00 of the Countrywide Loan Proceeds as a down payment on a house in Antioch, Illinois (the "Antioch House"). (*Id.*) She deposited another

$172,000.00 of the proceeds into a brand new bank account she opened on May 4, 2006, at Harris Bank (the "Harris Account") under her name as trustee and with her daughter as beneficiary. (*Id.*)

In May or June 2006, Robert moved from the Northbrook House to the Antioch House without Schaudt. (*Id.* 5.) In November 2006, Schaudt joined Robert at the Antioch House, and they lived there together until late 2009. (*Id.*)

On February 15, 2007, the United States filed an action against Schaudt, Robert, Countrywide Bank, and others (the "District Court Case") seeking an order: (1) entering judgment against Robert in the amount of the tax debt; (2) foreclosing on the tax liens against the Northbrook House and the Antioch House; (3) setting aside the conveyance of the Northbrook House to Schaudt; (4) entering a money judgment against Schaudt equal to the value of the Northbrook House; and (5) imposing a constructive trust based on unjust enrichment. (*Id.* 5-6.)

On October 8, 2008, Magistrate Judge Arlander Keys granted summary judgment to the United States on its claim that Schaudt took title to the Northbrook House subject to the taxes assessed against Robert prior to the transfer.[3] (*Id.* 6.)

On January 21, 2009, Judge Keyes concluded that the transfer of the Northbrook House was constructively fraudulent and he "impose[d] a constructive trust on the Antioch property to the extent the equity in the Northbrook House is not sufficient to satisfy Robert's tax debts." (*Id.*

---

[3] In her opening brief to this Court, Schaudt argues that she did not take title to the Northbrook House subject to the tax liens because no tax liens were attached to the house as of December 5, 2005, the time of the divorce. (Appellant's Br. 3.) She further argues that she would never have taken the house if she knew there were tax liens on. (Reply 3.) But whether she took title to the Northbrook House subject to the taxes assessed against Robert is an issue that was raised and litigated before Judge Keyes in the District Court Case. *See U.S. v. Schaudt*, No. 07 C 0895, 2008 WL 4567645, at *7 (N.D. Ill. Oct. 8, 2008). Therefore, Judge Keyes' summary judgment ruling that Schaudt took the Northbrook House subject to the taxes assessed against Robert prior to the transfer is binding upon Schaudt in the Bankruptcy Court under the doctrine of *res judicata*. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).

6-7.) He then denied Schaudt's motion to reconsider. (*Id.*) On July 24, 2009, Schaudt filed for Chapter 7 bankruptcy (the "Bankruptcy Case"). (*Id.*)

On October 1, 2009, Judge Keyes entered judgment in the District Court Case in the amount of $585,267.04, plus interest, against Robert, but took no further action against Schaudt because the case against her was stayed due to her bankruptcy filing. (*Id.* 7.)

On December 24, 2009, the United States filed an adversary complaint in the Bankruptcy Case asking the Bankruptcy Court to deny the discharge of any debt Schaudt might incur as a defendant in the District Court case. (*Id.*)

On February 8, 2010, after the stay in the District Court Case had been lifted, Judge Keyes entered final judgment against Schaudt. (*Id.*) Under the judgment, the Northbrook and Antioch Houses were to be sold with proceeds going towards satisfaction of Robert's tax debts. (Final J., Feb. 8, 2010, Case No. 07 C 0895, Dkt. #213, 3-5.) Any proceeds remaining from the sale of the Northbrook House were to go to Robert; any proceeds remaining from the sale of the Antioch House were to go to Schaudt. (*Id.* 3, 5.)

In 2011, the Bankruptcy Court held a bench trial. (Bankr. Ct. Mem. Op. 1.) The Bankruptcy Court concluded that Schaudt "was an active and willing participant with Robert in the actually fraudulent transfer of the Northbrook House," and that the "shared fraud is imputed to [Schaudt] and created a debt that she owes to the United States, separate from [Robert's] tax debt." (*Id.* 26.) Therefore, the Bankruptcy Court concluded, "the United States has proven by a preponderance of the evidence that the debt was obtained by actual fraud" under 11 U.S.C. § 523(a)(2)(A). (*Id.*) Schaudt now appeals the Bankruptcy Court's ruling.

## Standard of Review

Federal district courts have jurisdiction over bankruptcy appeals pursuant to 28 U.S.C. § 158(a)(1). A bankruptcy court's legal conclusions are reviewed *de novo*, but its factual findings are reviewed for clear error. *See In re Smith*, 582 F.3d 767, 777 (7th Cir. 2009). "If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety," its factual findings should not be reversed, even if the reviewing court would have weighed the evidence differently. *Arlington LF, LLC v. Arlington Hospitality, Inc.*, 637 F.3d 706, 713 (7th Cir. 2011) (quoting *Freeland v. Endonis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008)).

## Discussion

In the ordinary course of a Chapter 7 bankruptcy proceeding, the debtor's assets are applied to the payment of his debts and, even though the assets may be insufficient to satisfy the debts in full, the debtor emerges from bankruptcy with the unpaid balance discharged so that he can start afresh. *McClellan v. Cantrell*, 217 F.3d 890, 892 (7th Cir. 2000). Some types of debt, however, are not dischargeable, including debt "obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). In determining whether a debt is dischargeable under § 523(a), courts apply a preponderance of the evidence standard. *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010).

Here, the Bankruptcy Court concluded that Schaudt, who filed for Chapter 7 bankruptcy in July 2009, obtained debt by actual fraud under § 523(a)(2)(A) because she was an active and willing participant with her ex-husband Robert in fraudulently transferring the Northbrook House to her. (Bankr. Ct. Mem. Op. 23-26.) Consequently, the Bankruptcy Court held, the debt

associated with the Northbrook House was obtained by actual fraud and was not dischargeable under § 523(a)(2)(A). (*Id.*)

Although her pleadings do not conform to the Federal Rules of Bankruptcy Procedure and do not state the specific grounds on which she appeals,[4] construing her pleadings liberally, as this Court must, *see Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001), Schaudt argues that the Bankruptcy Court erred in finding that (1) she knew about Robert's tax debt prior to the transfer of the Northbrook House and (2) her divorce from Robert was a sham. The Court addresses each argument in turn.

## I. Lack of Knowledge

Schaudt first argues that the Bankruptcy Court erred in finding that she knew about Robert's tax debt at the time the Northbrook House was transferred to her. (Appellant's Br. 3, 9-11.) A debt is not dischargeable under § 523(a)(2)(A) if a creditor shows that the debtor knowingly or recklessly made a false representation or omission with the intent to deceive upon which a creditor justifiably relied. *See Ojeda*, 592 F.3d at 716-17. Schaudt argues that she did not knowingly make any false representations with the intent to deceive at the time of the transfer in 2005 because she did not even know about Robert's tax debt until 2007. (Appellant's Br. 11.) After conducting a bench trial, the Bankruptcy Court found that assertion "difficult to believe." (Bankr. Ct. Mem. Op. 24.) The Bankruptcy Court's finding is a factual finding reviewed for clear error. *See In re Brock Equip. Co.*, 2002 WL 88919, at *3 (N.D. Ill. Jan. 22, 2002) (citing *In Matter of EDC, Inc.*, 930 F.2d 1275, 1279-80 (7th Cir. 1991)).

---

[4] Schaudt's pleadings fail to comply with nearly all of the requirements of the Federal Rules of Bankruptcy Procedure. For example, Rule 8010 provides that the appellant's brief shall contain a table of contents, with page references and a table of authorities cited, a statement of the basis of appellate jurisdiction, a statement of the issues presented, the applicable standard of appellate review, and sections labeled argument and conclusion. Fed. R. Bankr. P. 8010. Schaudt's brief contains none of those.

The record shows that Schaudt knew about Robert's tax problems by February 2000. For example, in the late 1990s, she was denied financing when trying to purchase a car because of tax liens filed by the IRS against her and Robert. (Bankr. Ct. Mem. Op. 24.) She hired an attorney to obtain "innocent spouse" recognition from the IRS for Robert's tax debts, and on February 24, 2000, she received a letter from the IRS disassociating her from Robert's tax debts. (*Id.*) The letter included three Certificates of Release of Federal Tax Lien releasing Schaudt from Robert's tax debts and listing Robert's tax debt. (*Id.*) This provided Schaudt with knowledge of Robert's tax debt. As the Bankruptcy Court noted, "[t]here is no credible evidence explaining how she purportedly lost that knowledge between February 2000 and the filing of the District Court Case [in February 2007]." (*Id.*) This Court agrees.

Nevertheless, Schaudt argues that, when she hired counsel and applied for "innocent spouse" status, she had no knowledge of Robert's tax debt because the IRS never notified her of the tax liens before she attempted to purchase the car. (Appellant's Br. 9-10.) But when and how the IRS notified her of the tax liens is not the issue here. Rather, it is whether she knew about Robert's tax debt before the Northbrook House was transferred to her in late 2005. The February 2000 letter from the IRS that listed Robert's tax debts plainly informed her of that debt. (Bankr. Ct. Mem. Op. 24.)

Furthermore, in 2005, prior to the transfer of the Northbrook House, Schaudt and Robert met with a tax attorney to discuss Robert's tax debts.[5] (*Id.* 24-25.) This meeting also provided Schaudt with knowledge of the tax liabilities.

---

[5] In her opening brief to this Court, Schaudt argues that: (1) she first met with the tax attorney after February 2007; (2) Robert lied when he said that she met with him and the tax attorney prior to the divorce; and (3) the tax attorney testified that he had not met with Schaudt prior to the divorce. (Appellant's Br. 11.) The Bankruptcy Court, however, after considering all of the evidence, including the evidence Schaudt mentions in her opening brief, concluded that Schaudt had, in fact, met with Robert and the tax attorney to discuss Robert's tax debts prior to the transfer of the

8

Undaunted, Schaudt argues that she was ignorant of Robert's tax debt because she was separated from Robert between 1995 and 2002 and removed from any financial matters. (Appellant's Br. 9.) Be that as it may, Schaudt received notice of Robert's tax debt in February 2000. (Bankr. Ct. Mem. Op. 24.) Moreover, in 2002 she reunited with Robert, and in 2005 she and Robert conferred with a tax attorney to discuss Robert's tax issues. (*Id.* 3, 24.) Thus, the Bankruptcy Court's conclusion that Schaudt had knowledge of Robert's tax debt prior to the transfer of the Northbrook House in December 2005 was not clearly erroneous.[6]

## II. Sham Divorce

Schaudt also argues that the Bankruptcy Court erred in determining that her divorce from Robert was a sham. (Appellant's Br. 4-7.) Courts have recognized that divorce can be used to lend an air of legitimacy to an otherwise fraudulent transfer. *See*, *e.g.*, *In re Chevrie*, 2001 WL 120132, at *10 (Bankr. N.D. Ill. Feb. 13, 2001) (finding the transfer of a marital home pursuant to a divorce settlement fraudulent because the transfer was made for the purpose of placing the home outside of the reach of the IRS). Such sham divorces often share certain "badges of fraud," including: (1) a quickly agreed upon property division; (2) the completion of the divorce proceeding on a "fast-track;" (3) the fact that only one of the spouses is represented by counsel in

---

Northbrook House. (Bankr. Ct. Mem. Op. 24-25.) The Bankruptcy Court noted that although Robert made "shaky attempts to place those meetings [with the tax attorney and Schaudt] as occurring post-divorce, the evidence shows that they consulted tax counsel in the few months leading up to the filing of the divorce by [Schaudt] on November 15, 2005." (*Id.* 24-25.) After a review of the record, this Court concludes that the Bankruptcy Court's account of the evidence is more than "plausible in light of the record viewed in its entirety." *Arlington*, 637 F.3d at 713. Accordingly, the Bankruptcy Court's finding that Schaudt and Robert met with tax counsel to discuss Robert's tax debt prior to the transfer of the Northbrook House is not clearly erroneous and is affirmed.

[6] Schaudt also argues that she was not aware of Robert's tax debts prior to the transfer of the Northbrook House because, at divorce mediations she attended with Robert in November and December 2005, the mediator never mentioned the tax debt. (Appellant's Reply 7.) The Bankruptcy Court, however, found that Schaudt was aware of Robert's tax debt in February 2000 and August 2005, months before the mediation took place.

the divorce proceeding; (4) the fact that the spouses continue to live together after the divorce decree in the very house that was transferred; (5) the fact that the transferor spouse continues to pay the mortgage, taxes, and other costs on the transferred house; and (6) the inequitable distribution of debts and assets in the divorce. *Id.*; *see also In re Pilcher*, No. 05-8044, 2008 WL 2682858, at *4 (Bankr. C.D. Ill. Jun. 25, 2008); *In re Hill*, 342 B.R. 183, 199-200 (Bankr. D.N.J. 2006); *In re Zamudio*, No. 04 A 02922, 2005 WL 2035969, at *9-10 (Bankr. N.D. Ill. Aug. 23, 2005); *In re Rodgers*, 315 B.R. 522, 531 (Bankr. N.D. 2004); *In re Boba*, 280 B.R. 430, 434-35 (Bankr. N.D. Ill. 2002); *In re Dunham*, No. 98-1466-MWV, 99-1054-MWV, 2000 WL 33679421, at *4 (Bankr. D.N.H. 2000).

Here, the Bankruptcy Court found sufficient "badges of fraud present indicative of a sham divorce." (Bankr. Ct. Mem. Op. 26.) A finding of fraudulent intent in support of a fraudulent transfer claim is a finding of fact that is reviewed for clear error. *Freeland*, 540 F.3d at 733. Based on the record, the Bankruptcy Court's conclusion that Schaudt's divorce from Robert was a sham was not clearly erroneous.

The record shows that in 2005, when Schaudt met with Robert and the tax attorney to discuss Robert's tax debt, the IRS was already inquiring about the ownership of the Northbrook House and communicating with the attorney. (Bankr. Ct. Mem. Op. 25.) Eight days after the IRS acknowledged receipt of a title report on the Northbrook House, Schaudt filed for divorce. (*Id.*) Then, she and Robert, who was unrepresented by counsel, quickly came to a lopsided settlement favoring her. (*Id.* 3, 25.) Indeed, less than three weeks after she filed for divorce, the judge entered an uncontested dissolution judgment incorporating an agreement pursuant to which Schaudt received: (1) the Northbrook House, which was the very asset into which the IRS had been inquiring and valued at $539,000.00; (2) $8,000.00 per month from Robert indefinitely,

even upon remarriage; and (3) Robert's assumption of any pre-divorce tax liabilities. (*Id.* 25.) In return, Robert received only Schaudt's 2% interest in Zeus Concepts, valued at $84,000.00. (*Id.*) Moreover, after the divorce, Robert continued to live with Schaudt in the Northbrook House. (*Id.* 26.)

The Bankruptcy Court found additional evidence that could plausibly support the conclusion that Schaudt's divorce from Robert was a sham and that Schaudt's assertions otherwise were not credible. After Robert's interest in the Northbrook House had been transferred to her, Schaudt used the Northbrook House as collateral to take out a $377,300.00 loan. (*Id.* 3-4.) In the loan application, she misrepresented that she had owned the Northbrook House for 26 years, had $13,000.00/month in employment income, was a vice president of Zeus Concepts, and had been working at Zeus Concepts for the past 26 years.[7] (*Id.* 4.) Schaudt then used approximately $170,000.00 of the loan proceeds as a down payment on the Antioch House, where she and Robert lived together from November 2006 until late 2009. (*Id.* 5) She deposited another $172,000.00 of the loan proceeds into a brand new bank account she opened under her name as trustee and with her daughter as beneficiary. (*Id.*) As the Bankruptcy Court concluded, "[t]he confluence and timing of these events go a long way to show that [Schaudt], not just Robert, was arranging the transfer of the Northbrook House at a time when the IRS was making

---

[7] Schaudt argues that she is not culpable for the false information on the applications because (1) she did not fill out the application herself, but verbally gave her information to a mortgage broker who then falsified the application unbeknownst to her even though she signed it; and (2) she was never given the opportunity to defend herself as to the false application because the government withdrew one of its claims related to the false application. (Appellant's Br. 6, 10.) But Schaudt had the opportunity to defend herself as to the false application. Indeed, at trial before the Bankruptcy Court, she was questioned extensively about the application, and she testified that the mortgage broker had filled out the application. (Bankr. Trial Tr., Jan. 18, 2011, at 118-136.) The Bankruptcy Court did not find her arguments credible. (Appellant's Reply 6, 10.) After reviewing the record, this Court finds that the Bankruptcy Court's conclusions are not clearly erroneous.

waves as to its ownership in order to frustrate the IRS' collection efforts." (*Id.* 26.) This Court agrees.

Nevertheless, Schaudt argues that the divorce was not a sham and that she and Robert continued to live together after the divorce first in the Northbrook House, and later in the Antioch House, for financial reasons. (Appellant's Br. 4.) She argues that she and Robert went to a mediator after she filed for divorce and the mediator told her that she should live with Robert because Robert could not afford to live on his own and still pay the children's college expenses and her monthly maintenance. (*Id.*) She further contends that, when she and Robert lived together in the Antioch House, they lived in separate quarters. (*Id.* 4.)

The Bankruptcy Court found that Schaudt's son "credibly testified" that his parents lived in separate areas of the Antioch House and that Robert stayed in the house with Schaudt to save costs when he and his sister were in college. (Bankr. Ct. Mem. Op. 26.) The Bankruptcy Court concluded, however, that the couple's "less than stellar marriage" was not enough to overcome all of the other evidence pointing to a sham divorce. Under the preponderance of the evidence standard, it must simply be "more likely than not" that debt was obtained through actual fraud. *See Ojeda*, 599 F.3d at 716; *Brown v. Bowen*, 847 F.2d 342, 345-46 (7th Cir. 1988). The Bankruptcy Court concluded that the government had met this burden. (Bankr. Ct. Mem. Op. 26.) The Bankruptcy Court's finding is "plausible in light of the record viewed in its entirety." *Arlington*, 637 F.3d at 713. Thus, the Bankruptcy Court's finding that Schaudt's divorce from Robert was a sham is affirmed.

## Conclusion

For the reasons herein, the Court affirms the Bankruptcy Court's ruling. This case is hereby terminated.

**SO ORDERED**             **ENTER: 3/11/13**

_____
**JOHN Z. LEE**
**U.S. District Judge**